Filed 11/19/13  In re Steven C. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re STEVEN C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | F066148 |
| Plaintiff and Respondent, | (Super. Ct. No. 09CEJ600276-3) |
| v. | |
| STEVEN C., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Fresno County.  Gary Hoff, Judge.

Mitchell Law Group and Michael E. Mitchell for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Robert K. Gezi and Ryan B. McCarroll, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a contested jurisdiction hearing, the juvenile court found that appellant, Steven C., a minor, committed two counts of battery (Pen. Code,[1] § 242; counts 4, 6) and individual counts of assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4); count 1), second degree robbery (§§ 211, 212.5, subd. (c); count 2) and grand theft (§ 487; count 3). The court also found true an enhancement allegation that appellant, in committing the count 1 assault, personally inflicted great bodily injury on the victim, within the meaning of section 12022.7, subdivision (a) (section 12022.7(a)). Following the subsequent disposition hearing, the court ordered appellant committed to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities and set his maximum term of physical confinement at nine years four months.

On appeal, appellant challenges the sufficiency of the evidence supporting the true finding on the great bodily injury enhancement allegation and his adjudications of robbery and grand theft. We affirm.

## FACTS[2]

### *Prior to the Attack*

At approximately 9:50 p.m. on June 5, 2012, Amanda Ardemagni, age 20, and her close friend Andrew Pope, age 21, met at a park in Fresno to talk about a personal problem that was upsetting Ardemagni. After some discussion, Pope suggested they take a drive, Ardemagni agreed, and the two began walking to Pope's car, at which point they heard people behind them. Pope and Ardemagni turned around and saw a group of four male youths, including appellant and Dominic F. (Dominic).

---

[1]    All statutory references are to the Penal Code.

[2]    Because appellant's arguments on appeal are directed at the count 2 and count 3 substantive offenses and the enhancement found true in connection with the count 1, our factual summary is limited to the events giving rise to counts 1, 2 and 3.

Ardemagni testified Pope asked, "are you guys good," and Dominic replied, "yeah, nigga, we good.  What the fuck are you doing[?]"  Ardemagni turned and began walking to her car, and Pope indicated to the four youths he wanted to avoid "trouble" and that he and Ardemagni were leaving.  Pope then turned around and continued walking in the direction of the cars.  The youths followed and, according to Ardemagni, "[made] comments like come here, baby, we'll show you a good time ...."

Ardemagni and Pope continued walking to their cars.  Pope again turned around and again asked "are you guys good[?]."  Dominic responded, "we faded, nigga, we faded."  Pope again told the four that he and Ardemagni were leaving.

### The Attack – Pope's Testimony

At that point, as Pope was turning away, someone—Pope could not tell who—struck him somewhere in the area of the left side of his neck.  Pope turned to Ardemagni, told her to run, and put his arms up to protect his face, at which point he "was being hit again."  He could not tell who was hitting him or how many people were hitting him.  There were "a lot of fists being thrown" and he was "being hit a lot" on his neck and head.  At some point, "[his] body just got tired … and [he] fell" to the ground.  While he was on the ground his "neck and head continued to get hit."  He had his eyes closed, but it felt like he was getting "hit" with shoes and that "multiple people" were hitting him.  He heard someone say, "Take his fucking phone and his wallet" and he felt "hands shuffling [sic] on [his] pants to get things out of [his] pockets."  He was struck "a lot" while he was on the ground.

### The Attack – Ardemagni's Testimony

Immediately after Pope said a second time that he and Ardemagni were leaving, Dominic "called [Pope] a punk ass nigga" and pushed him with both hands in the middle of his back.  Pope told Ardemagni to run, and immediately thereafter one of the four youths—not appellant or Dominic—punched Pope in the right temple, causing Pope to stumble, but not fall to the ground.  At that point, appellant, Dominic and their two

3.

companions "gathered around" Pope. Ardemagni ran out into the street, and as she ran she dialed 911. As she made the 911 call she "vaguely heard them [the assailants] ... talking about finding [Pope's] wallet and his phone." She stopped and turned back around, at which point Pope was on the ground, 22 feet away from where she was when she placed the 911 call. Pope was not in the "exact same place" he had been when Ardemagni turned and ran. She "didn't see what happened" in the interval between when she began running and the time she looked back to see Pope being attacked.

Dominic was punching Pope in the chest and back, kicking him in the back and "rummaging" through Pope's back pocket, where his wallet was, and his sweater pockets. Another assailant—not appellant—was "kicking and stomping on [Pope's] head." Appellant was "[k]icking [Pope] as hard as he could," in the stomach and his "sides." The fourth attacker was "just kind of kicking … and punching" Pope, "down towards the legs." Pope "was kind of rolling around from the different blows he was getting."

The attack ended when Ardemagni flagged down a passing car, and appellant and his companions ran off. From when Pope was first struck to the point the attack ended, approximately "[one] minute if that, maybe a little more" elapsed. Ardemagni saw appellant kicking Pope for a period of 30 seconds to one minute. Asked to rank the assailants in terms of "who was striking [Pope] the most," Ardemagni placed appellant second. At the time of the jurisdiction hearing her memory of what the assailants were wearing was "starting to diminish," but, she testified, "I can see them perfectly in my head and everything that happened."

Ardemagni realized Pope's phone was missing while still at the park shortly after the attack, when she wanted to call Pope's father but discovered the phone was not in Pope's pocket. She discovered Pope's wallet was missing later at the hospital where Pope was taken following the attack.

4.

*Post-Attack Statements*

Fresno Police Detective Christopher Lee testified to the following: He spoke with Pope and Ardemagni 16 days after the attack, on June 21, 2012. Ardemagni stated she heard the attackers say "get his phone and wallet," but that was "after the assault," and she "made no mention" of the attackers going through Pope's pockets. Pope "didn't make any mention … that [the attackers] asked for his cell phone or said get his wallet or go through his pockets or anything of that nature[.]"

Fresno Police Officer Eric Sanders testified to the following: He spoke with Pope at the hospital on the night of the attack. Pope stated he had his cell phone and wallet with him while he was at the park but he did not have those items with him at the hospital, and he "did not know where it [*sic*] went." Pope "never told [Sanders] that he heard ... suspects say get his wallet, get [his] phone, anything of that nature," and he "[n]ever said anything about he felt people rummaging through his pockets taking items from him at the scene[.]"

*Pope's Injuries*

Pope testified to the following: At some point, while he was down on the pavement being beaten, he lost consciousness. When he regained consciousness he was on grass and Ardemagni was holding his head and neck. He suffered cuts requiring sutures above both eyebrows; the cuts left scars that were visible at the time of the jurisdiction hearing in September 2012. He was treated in a hospital emergency room the night of the attack and he left the hospital early the next morning. The "brunt [*sic*]" of his injuries were to his face, head and neck. He "was in bed for two weeks" following the attack, in the week following the attack he experienced pain he described by quantifying it as eight on a scale of 10, and he suffered migraine headaches for approximately three weeks. In addition, both his eyes were swollen following the attack, and he suffered from blurred vision for two to three weeks thereafter.

Ardemagni testified that when she went to Pope's assistance after the assailants had fled, he was unconscious, he had a lump the size of a golf ball above his left eye, his left eye was swollen shut, there was "a bunch of blood coming from the right side of his forehead," and there was "blood all over his face."

Fresno Police Officer Steven Jaquez testified that when he arrived on the scene Pope was lying on the ground, and he was "in and out of consciousness."

Dr. Richard Goka, a physician, testified to the following: He reviewed hospital records, an investigator's report and photographs of Pope. According to the records, "[Pope's] injuries were basically lacerations to both eyebrows that require[d] suturing[,] and multiple abrasions and contusions." The bruising was "extensive." The two eyebrow lacerations required, respectively, one and two sutures. There was no record of any bleeding except as a result of those lacerations. Any laceration to the face can cause profuse bleeding. Following the attack Pope's level of "responsiveness" was "normal." Dr. Goka opined as follows: the lacerations above Pope's eyes were "superficial"; "if [Pope] had loss of consciousness he probably did have a concussion"; and overall, based on "the fact there were no permanent residuals," Pope's injuries were "[m]ild to moderate."

## DISCUSSION

### A.     Great Bodily Injury Enhancement.

Section 12022.7(a) provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison of three years."

As indicated above, appellant contends the evidence did not support the true finding of the section 12022.7(a) great bodily injury enhancement. His argument consists of two parts. He argues that the evidence was insufficient to establish (1) the injuries

6.

suffered by Pope constituted "great bodily injury" (§ 12022.7(a)), or that (2) appellant "personally inflict[ed]" (*ibid.*) such injury. We address these two claims in this order.

**1.      The evidence was sufficient to establish Pope suffered "great bodily injury."**

Appellant bases his challenge to the great bodily injury element of the section 12022.7(a) enhancement, in turn, on the following claims: Dr. Goka classified Pope's injuries as "mild to moderate" and the lacerations above Pope's eyes as "superficial"; Pope "did not suffer from any long term injuries or disfigurement"; he did not suffer any fractures; and tests performed shortly after the attack indicated his responsiveness was normal. This challenge is without merit.

We first note that Dr. Goka's opinion that Pope's injuries were mild to moderate, which was based on information in the medical records that Pope suffered no permanent injury, and appellant's related claim that Pope did not suffer any "long term injuries or disfigurement" provide little support for appellant's position. Section 12022.7, subdivision (f) defines "great bodily injury" as "significant or substantial physical injury." As our Supreme Court stated in *People v. Escobar* (1992) 3 Cal.4th 740 (*Escobar*), "Clearly, [this] standard contains no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*Id.* at p. 750; accord, *People v. Cross* (2008) 45 Cal.4th 58, 64 [injury "need not be so grave" as to cause victim permanent, prolonged, or protracted bodily damage].)

"It is well settled that the determination of great bodily injury is essentially a question of fact, not of law. '"Whether the harm resulting to the victim ... constitutes great bodily injury is a question of fact for the [trier of fact]. [Citation.] If there is sufficient evidence to sustain the [trier of fact's] finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding."'" (*Escobar*, *supra*, 3 Cal.4th at p. 750.)

While section 12022.7, subdivision (f) defines great bodily injury as indicated above, another section of the Penal Code defines "serious bodily injury" as "a serious impairment of physical condition, including, but not limited to, the following: *loss of consciousness*; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4), italics added.)  These two terms have "substantially the same meaning," (*People v. Hawkins* (1993) 15 Cal.App.4th 1373, 1375), and are "'essentially equivalent elements.'"  (*People v. Burroughs* (1984) 35 Cal.3d 824, 831, disapproved on another ground *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)  Here, the juvenile court reasonably could have credited the testimony of Pope, Ardemagni and Officer Jaquez that Pope lost consciousness.  This evidence alone is sufficient to establish Pope suffered great bodily injury.  The other factors cited by appellant—the superficial character of the lacerations to Pope's face and the absence of any "disfigurement" or fractures—establish, at most, that the evidence might be reconciled with a conclusion contrary to that reached by the court.  As indicated above, however, this is not sufficient to compel reversal.

Moreover, in addition to the evidence that Pope lost consciousness, the evidence also showed the following:  As a result of injuries sustained in the attack, Pope was confined to bed for two weeks, he was in severe pain for a week, he suffered blurred vision for three weeks, and he suffered migraine headaches for approximately three weeks.  Although, as appellant suggests, these effects of the beating do not rise to the level of permanent injury, they nonetheless establish that appellant suffered "significant or substantial" (§ 12022.7, subd. (f)) injury, and provide further support for the juvenile court's finding that Pope suffered "great bodily injury" (§ 12022.7(a)).

**2.	The evidence was sufficient to establish the "personally inflict[ed]" element of the section 12022.7(a) enhancement.**

Appellant argues that Pope's injuries were to the neck and head, and there was no evidence appellant struck Pope anywhere other than in the stomach and sides. Indeed, appellant notes, Ardemagni's testimony was particularly clear on this latter point because she testified she had a good memory of the incident. Therefore, appellant asserts, the evidence was insufficient to establish that he "personally inflict[ed]" great bodily injury on Pope, within the meaning of section 12022.7(a).

Appellant bases this claim on *People v. Cole* (1982) 31 Cal.3d 568 (*Cole*). In that case, the defendant (during a burglary and robbery) ordered his accomplice to kill the victim and blocked the victim's escape while his accomplice repeatedly struck the victim. The sentencing court imposed an enhancement under a prior version of section 12022.7, to which we refer as former section 12022.7, which is identical in all relevant respects to section 12022.7(a). However, the defendant never himself struck the victim. (*Cole,* at p. 571.) The defendant challenged the former section 12022.7 enhancement, and *Cole* held the "personally inflicts" statutory language clearly and unambiguously required that the individual accused of inflicting great bodily injury must be "the person who directly acted to cause the injury. The choice of the word 'personally' necessarily excludes those who may have aided or abetted the actor directly inflicting the injury." (*Cole*, at p. 572.)

In *People v. Corona* (1989) 213 Cal.App.3d 589 (*Corona*), the Court of Appeal considered whether *Cole* precluded a former section 12022.7 enhancement when the defendant was one of numerous assailants who attacked the victim, knocked him to the ground and repeatedly hit and kicked him, causing the victim numerous significant injuries. Addressing the true finding on the enhancement allegation, *Corona* held there was substantial evidence to support the finding. (*Corona*, at pp. 591–595.) Moreover, *Corona* concluded the *Cole* analysis "makes no sense when applied to a group pummeling." (*Corona*, at p. 594.) "[W]hen a defendant participates in a group beating

9.

and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*Ibid.*)

The holding in *Corona* was affirmed by our Supreme Court in *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*). There, the court acknowledged that to personally inflict injury, a person must "do so directly rather than through an intermediary ...." (*Id*. at p. 493.) However, the court observed that nothing in the terms "personally" or "inflicts" as used in conjunction with "great bodily injury" requires the defendant to act alone in causing the victim's injuries. (*Ibid.*) Further, "nothing in *Cole* precludes a person from receiving enhanced sentencing treatment where he joins others in actually beating and harming the victim, and where the precise manner in which he contributes to the victim's injuries cannot be measured or ascertained." (*Id*. at p. 495.)

Appellant argues the reasoning of *Corona* and *Modiri* does not apply to the instant case because, he asserts, here it can be ascertained how the victim suffered his injuries because the evidence establishes that appellant was not among the assailants who inflicted those injuries. We disagree. The juvenile court could reasonably believe it was impossible to determine who caused the injuries. After one of the assailants punched Pope in the face, appellant's group surrounded him, and Ardemagni ran out into the street, where she dialed 911 and flagged down a passing car. When she turned back to view the attack, Pope was not in precisely the same spot where the attack began. The evidence thus suggests Ardemagni was not always in a position to see precisely who did what during the incident. Moreover, Ardemagni testified Pope was "rolling around" as he was being struck, and in describing the blows he received to the area of his head, Pope testified it felt like "multiple people" were hitting him. This evidence renders it difficult to determine exactly "whose foot could be traced to a particular kick [and] whose fist could be patterned to a certain blow." (*Corona*, *supra*, 213 Cal.App.3d at p. 594.)

10.

Thus, the circumstances in this case present the type of scenario for which the *Corona-Modiri* group pummeling analysis is appropriate. Appellant "join[ed] others in actually beating and harming the victim," and "the precise manner in which he contribute[d] to the victim's injuries cannot be measured or ascertained." (*Modiri*, *supra*, 31 Cal.3d at p. 495.) Accordingly, the court did not err in finding appellant personally inflicted great bodily injury on the victim.

**B.  Adjudication of Robbery and Grand Theft.**

Appellant contends the evidence was insufficient to support his adjudications of robbery and grand theft. We disagree.

**1.  Legal background.**

"The elements of robbery are:  (1) a taking (2) of personal property (3) in the possession of another (4) from her person or immediate presence (5) against her will (6) accomplished by means of force or fear (7) with an intent to permanently deprive." (*People v. Prieto* (1993) 15 Cal.App.4th 210, 213, fn. omitted.)  "Where the elements of force or fear are absent, a taking from the person is grand theft, a lesser included offense of robbery." (*People v. Jones* (1992) 2 Cal.App.4th 867, 869.)

All persons who aid and abet the commission of a crime are criminally liable as principals. (§ 31; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529 (*Nguyen*).)  A person aids and abets the commission of a crime "'when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Delgado* (2013) 56 Cal.4th 480, 486.)  "[I]f a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* 'commission' of that offense.' [Citation.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.)  "It is legally and logically impossible to both form the requisite intent and in fact

11.

aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

"[A]n aider and abettor need not share the intent of the principal actor .... What is required is that the aider and abettor either share the actor's intent or intend to commit, encourage, or facilitate the commission of a crime. [Citation.] The defendant might act out of friendship for the perpetrator, dislike for the victim, general meanness, or just for the thrill of it, but so long as he intentionally encourages or facilitates the commission of the offense he is guilty as an aider and abettor. [Citation.]" (*Nguyen, supra,* 21 Cal.App.4th at p. 534.)

The elements of aiding and abetting may be determined from a variety of factors, including presence at the scene of the crime, companionship, conduct before and after the offense and flight. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

"Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment." (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 329.)

**2.     Analysis.**

As indicated above, the following evidence was adduced at the jurisdiction hearing: Pope testified that while he was on the ground being beaten he heard one of his attackers direct the others to take his (Pope's) cell phone and wallet and he felt hands trying to remove things from his pockets. Ardemagni testified she heard the attackers talking about taking Pope's property. Officer Sanders testified Pope said he had his cell phone and wallet when he was at the park but no longer had these items by the time he got to the hospital. Ardemagni testified that Dominic, at the time he was beating Pope, was also going through Pope's pockets, and that for a period of 30 seconds to one minute, appellant was kicking Pope with great force. Ardemagni also testified that after the attack, Pope's cell phone and wallet were discovered missing.

Thus, the evidence showed that at the time appellant and his companions were beating Pope, one of the attackers directed the others to steal the victim's wallet and cell phone; both items were in his possession when he was at the park but turned up missing after the attack; and the attackers fled the scene together. Under the principles summarized above, this evidence was sufficient to support the conclusion that appellant knew—either because he told the others to take Pope's cell phone or because he heard one of the other attackers do so—that at least one of the other participants in the attack intended to steal Pope's wallet and cell phone; both items were in fact taken by one or more of the attackers; and appellant, by his actions, assisted in and facilitated the taking. Therefore, the evidence was sufficient to establish appellant's guilt of the robbery and grand theft on an aiding-and-abetting theory.

Appellant's argument to the contrary, as best we can determine, consists of three parts. First, he argues the evidence was insufficient to establish he committed either robbery or grand theft because the evidence did not establish that *he* intended to take Pope's property. This contention is without merit. As demonstrated above, it is not necessary that the People prove appellant intended to steal in order to establish appellant's guilt as an aider and abettor. Rather, as is also demonstrated above, the intent element necessary for aider and abettor liability is established where, as here, the evidence shows the accused intended to, and did, aid in and/or facilitate the commission of a crime.

Second, it appears appellant argues the evidence was insufficient to establish that the cell phone and wallet were taken at all, by anyone. It further appears appellant bases this claim, in part, on his claims there was no evidence appellant took any of Pope's property, no evidence appellant or any of his companions demanded Pope's property before the attack, no evidence Pope's property was later found on appellant's person, at his residence or among his belongings; and no evidence that appellant, by word, "motion[]," or "signal[]," encouraged the other assailants to take Pope's property. In

addition, in an attack on the credibility of Ardemagni's testimony that she saw Dominic rummaging through Pope's pockets, he notes that she did not mention this to Detective Lee when she spoke to him just days after the events giving rise to the instant offenses.

These factors do no more than militate in favor of a conclusion contrary to that reached by the juvenile court. They do not compel a contrary finding. Appellant's argument, in essence, asks us to reweigh the evidence. This we will not do. As indicated above, we resolve conflicts in the evidence, and the inferences drawn from the evidence, in favor of the judgment. Under the principles of appellate review summarized above, the evidence that Pope's property was missing after the attack, coupled with the evidence that one of the attackers was rummaging through Pope's pockets during the attack and directing the others to take Pope's property, was sufficient to establish that Pope's cell phone and wallet were, in fact, taken from him by one of the assailants.

Finally, appellant argues that even if the evidence was sufficient to establish the taking element of both grand theft and robbery, the "evidence clearly establishes that any intent to steal ... occurred *after* the assault took place." (Italics added.) The taking of Pope's property, appellant asserts, "appeared to be ... an afterthought."

Appellant acknowledges, as he must, that Pope testified that *while the attack was ongoing*, one of the attackers exhorted the others to take Pope's wallet and cell phone and Ardemagni heard the assailants talking about taking Pope's property, and that such evidence militates in favor of the conclusion that the intent to commit theft and robbery was formed before the assault was concluded. He argues, however, that the testimony of Pope and Ardemagni on these points is not credible for the following reasons: Given the conditions existing at the time—it was night, Ardemagni was calling 911 and she was 22 feet away—"[i]t seems unlikely [that Ardemagni] was in a position to see whether the assault was completed when the statement was made regarding taking Mr. Pope's property"; Detective Lee testified that Ardemagni told him the statement regarding the taking of Pope's property was made after the assault had concluded, that Ardemagni did

14.

mention the assailants going through Pope's pockets, and that Pope did not mention the assailants going though his pockets or saying anything about taking his property; and Officer Sanders testified that Pope made no mention to him about the assailants going through his pockets and saying anything about taking his property.

Appellant's argument on this point also fails because, we reiterate, we resolve all conflicts in the evidence, and the inferences from the evidence, in favor of the judgment. The juvenile court reasonably could have credited the testimony of Ardemagni and Pope regarding the statements and actions of the attackers during the attack, testimony which supports the conclusion that the intent to take Pope's property was formed before the assault was concluded. Thus, for the reasons set forth above, substantial evidence supports appellant's robbery and grand theft adjudications.

## DISPOSITION

The judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
CORNELL, J.


_____
OAKLEY, Pro Tem J.*

_____

*       Judge of the Superior Court of Madera County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15.